Gary W. LAPINE, Plaintiff,

v.

**TOWN OF WELLESLEY, Defendant.**

No. Civ.A. 95–12233–RBC.[1]

United States District Court,
D. Massachusetts.

April 26, 2001.

---

1. With the parties' consent, this case was referred and reassigned to the undersigned for all purposes, including trial and the entry of judgment, pursuant to 28 U.S.C. § 636(c).

James A. Goodhue, Wellesley, MA, Albert S. Robinson, Grindle, Robinson & Kertzman, Wellesley, MA, for defendant.

Paul M. Sushchyk, Berg & Laipson, Worcester, MA, for plaintiff.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING REMEDY AND DAMAGES AFTER A FINDING OF LIABILITY

COLLINGS, Chief United States Magistrate Judge.

### I. INTRODUCTION

The plaintiff, Gary W. Lapine (hereinafter "Lapine" or "plaintiff"), brings claims under the Veterans' Reemployment Rights Act, 38 U.S.C. §§ 4301–4306, (VRRA) against defendant Town of Wellesley (hereinafter, "the Town" or "defendant"). Lapine resigned from the Wellesley Police Department effective May 13, 1990; he reported for active duty in the Army on July 22, 1990. His three-year term ended August 30, 1993. In this action, Lapine seeks reinstatement as a police officer in the Wellesley Police Department, an award of approximately $165,000 for lost pay from the date of his application for reinstatement in 1993 and other damages, including sick pay and vacation pay.

After completion of discovery, each party moved for the entry of judgment as a matter of law. Lapine's motion for summary judgment was denied during oral arguments; the Town's motion was denied on July 7, 1997. *Lapine v. Town of Wellesley*, 970 F.Supp. 55 (D.Mass., 1997).

Thereafter, a non-jury trial was held, transcripts were prepared, the parties filed their proposed findings of fact and conclusions of law, and final arguments were

heard. On February 22, 2001, I issued Partial Findings of Fact and Conclusions of Law which addressed the issue of liability. In that opinion, I found that the Town was liable under the VRRA, but I did not address the proper remedy and measure of damages to which Plaintiff is entitled. This opinion hereby incorporates the February 22, 2001 opinion in full and further addresses the issue of the proper remedy and the damages to which Plaintiff is entitled.

## II. FINDINGS OF FACT[2]

1. Lapine was appointed as a full-time police officer in the Town's Police Department on May 9, 1977. (Stip.¶ 5)[3]

2. As of April of 1990, Lapine worked the midnight shift and held the rank of patrolman in the Wellesley Police Department, with a pay classification of Patrolman–EMT (P18), at a step 4; he received a weekly base salary of $631.00. (Stip. ¶ 6 and Tr. 90) Lapine also received $35.00 per week for educational incentive pay and $23.00 per week for shift differential pay.[4] (Tr. 90). Had Lapine been employed continuously by the Town in his previous position, he would have earned a weekly salary of $740.69 for 1993, $758.12 for 1994, $775.12 for 1995, $775.12 for 1996 and $775.12 for 1997. (Tr. 94–95)

3. Moreover, Lapine received vacation time and sick leave. (Tr. 91) For the years 1993–October, 1997, Lapine would have been awarded 79 shifts of vacation time: 15 shifts for 1993–94, 20 shifts for 1994–95, 20 shifts for 1995–96, and 4 shifts for 1996–October 1, 1997. (Tr. 99) The Collective Bargaining Agreement awarded annual vacation time of between 5 shifts and 30 shifts, depending on how long an employee had been continuously employed on a full-time basis with the Town. For example, an employee who had been with the Town for 13 years, as Lapine had been as of 1990, would have received between 20 and 25 shifts of vacation time annually. (Exh. 66).

4. On April 30, 1990, Lapine submitted a letter (Exh. 1) to the then Chief of Police, resigning from the Town's police department, effective May 13, 1990. (Stip.¶ 8)

5. On April 30, 1990, Lapine completed and submitted an application (Exh. 2) to the Wellesley Retirement Board for withdrawal of his accrued retirement benefits, which amounted to $31,021.79. (Stip.¶ 8) Both Lapine and the Town had made contributions to Lapine's pension fund. (Tr. 92)

6. On May 7, 1990, Lapine completed and submitted an Application for Active Guard Reserve Duty (Exh. 3) and an Application for Active Duty for Training for Members of the Army National Guard and U.S. Army Reserve (Exh. 4), and on June 20,

---

[2]. Only those facts that are relevant to the damages issue are included here. In some instances, the facts recounted may be repetitive of those included in the February 22, 2001 opinion but such repetitive facts are included only if they bear on the damages question.

[3]. A number of findings based on the Stipulation of the parties are adopted as the Court's findings verbatim, but without quotation marks; others are reworded and/or supplemented.

[4]. The testimony on this point is not clear. Lapine testified that "[t]here was a shift differential pay of between 23 and $25.00 per week" but does not indicate if he was receiving $23.00 or $25.00 per week. The Collective Bargaining Agreement between the Town of Wellesley and the Wellesley Police Association that was in place from July 1, 1993 to June 30, 1996 (Exh. 66)(the "Collective Bargaining Agreement"), however, indicates that employees working the second or third shift "shall be paid a premium of twenty-three ($23) dollars per week for work on such shifts." at p. 5.

1990, Lapine was issued orders (Exh. 6) to report on July 22, 1990 for active duty training at Fort Benjamin Harrison, Indiana, for forty days. (Stip.¶ 13)

7. On July 13, 1990, Lapine was issued orders (Exh. 7) to report for active duty on September 10, 1990. (Stip.¶ 14)

8. On September 3, 1990, Lapine executed an Oath of Extension of Enlistment or Reenlistment (Exh. 8) for a three year term expiring on August 30, 1993. (Stip.¶ 15)

9. On June 26, 1992, Lapine sent a letter to Wellesley Chief of Police, Thomas J. O'Loughlin (Exh. 9), "explor[ing] the opportunity or feasibility of re-employment with the Wellesley Police Department." (Stip.¶ 16)

10. Police Chief O'Loughlin wrote to Lapine on July 6, 1992 (Exh. 10) that it was unlikely that a position would be available to Lapine and indicated his reluctance to hire police officers through reinstatement. (Stip.¶ 17)

11. One year later, on July 6, 1993, Lapine sent another letter to Police Chief O'Loughlin (Exh. 11) requesting reemployment with the Wellesley Police Department under the VRRA, after his current AGR duty term ended on August 30, 1993. (Stip.¶ 18) This was the first time he informed anyone in an official position with the Town of Wellesley that he was seeking reemployment pursuant to the VRRA. (Tr. 126–9)

12. In a letter, dated July 14, 1993 (Exh. 12), Police Chief O'Loughlin, denied Lapine's request for reemployment under the VRRA. (Stip.¶ 19)

13. On August 31, 1993 Lapine was issued a Certificate of Release of Discharge from Active Duty, DD Form 214 (Exh. 13) and was honorably discharged. (Stip.¶ 20)

14. During his tenure with the Town, Lapine was subject to several disciplinary actions. As a result of these actions, the Town imposed punishments on Lapine. (Tr. 64) Specifically, in 1983, Lapine received a five-day suspension for putting a chemical in the uniform of one Sergeant Chaisson and in September of 1989, Lapine received a letter of reprimand for reporting late to a seminar and for failing to report for a paid detail. (Tr. 64–65, 138, 203) Additionally, in 1981, a recommendation was made to the Chief of the department that Lapine undergo stress counseling because he had been exhibiting some irrational behavior. (Tr. 166–67) For example, when on desk duty, Lapine failed to give proper service to several people who called in requesting assistance. (Tr. 167) Additionally, Lapine went into a rage and screamed at several youths who were at the station to bail out a friend who had been arrested. (Tr. 168) On another occasion, Lapine had a physical altercation with another police officer. (Tr. 168).

15. When Lapine left the police department in 1990, he was not subject to any disciplinary punishment or any restricted duty. (Tr. 65) In addition, just prior to the time he left the department in 1990, Lapine underwent a physical examination and was found to be in very good health. (Tr. 88)

16. In 1988, Lapine received an employee evaluation that gave him an overall rating of "definitely above average." (Tr. 65–66 and Exh. 49) In 1989, Lapine received another employee evaluation that again accorded him an overall rating of "definitely above average." (Tr. 67 and Exh. 57)

17. During his years with the Town, Lapine received several letters of commendation, two in 1983, one in 1986 and one in 1988. (Tr. 69–70 and Exhs. 27, 42 and 48)

18. If Lapine had been employed with the Town from August, 1993 to October,

1997, he would have earned $165,059.28.[5] (Tr. 95–97)

19. From August, 1993 to October, 1997, Lapine earned $64,229.00 in wages from various jobs and received "close to $10,000" in unemployment. (Tr. 135, 137).

20. Chief O'Loughlin, the Wellesley Chief of Police, hired at least 15 new officers between 1992 and 1997. (Tr. 194–95)

## III. CONCLUSIONS OF LAW

### A. Is Lapine Entitled to be Reinstated?

■ I determined previously that Lapine prevailed against the Town in this action. I must now, therefore, decide whether Lapine is entitled to reinstatement, benefits and lost wages. The test for determining whether a veteran is entitled to be reinstated at the job he held before entering the service is straightforward:

> Five eligibility criteria must be satisfied before a returning service member will be entitled to reemployment. The basic requirements are that the individual held a nontemporary position, left that position to enter active duty, served on active duty for less than four years, honorably performed military service, and requested reinstatement within ninety days of discharge....

*When Johnny (Joanny) Comes Marching Home: Job Security for the Returning Service Member under the Veterans' Reemployment Rights Act,* 132 Mil. L.Rev. 175, 180 (Spring, 1991) (citing 38 U.S.C. § 2021).[6]

■ I find that Lapine has met all five requirements for reinstatement. Obvious-ly, the position he left was not a temporary one. The general test for determining whether a position is considered temporary is whether the employee had a reasonable expectation that employment would be continuous and for an indefinite time. *Moe v. Eastern Air Lines,* 246 F.2d 215, 219 (5 Cir., 1957), *cert. denied* 357 U.S. 936, 78 S.Ct. 1380, 2 L.Ed.2d 1550 (1958). Lapine had been employed by the Town for thirteen years, and there is no evidence that he expected that his employment would not be indefinite. Thus, the position he left was not a temporary one.

Moreover, as set forth in the February 22 opinion, I found that he left his job with the Town to enter active duty. *See* 2/22/01 Opinion at 22. In addition, Lapine served on active duty for less than four years, from September, 1990 until August, 1993.

Finally, Lapine was honorably discharged from his duty, receiving a certificate of discharge in August, 1993, and he requested reinstatement with the Town within ninety days of his discharge. Indeed, he requested reinstatement in July, 1993, before he was even discharged. Therefore, I find that Lapine has satisfied all five prongs of the test for reemployment. The analysis does not end here, however, because the Town may have legitimate defenses to reinstating Lapine.

### B. Does the Town Have Any Legitimate Defenses?

■ The VRRA sets forth, in relevant part, that a returning veteran is entitled to be restored to his position or to a position of like seniority, status and pay "if still qualified to perform the duties of such

---

5. For purposes of this Opinion, I accept Lapine's mathematical calculations regarding his lost wages as correct. The Town did not present any contradictory evidence on this point.

6. Title 38 U.S.C. § 2021 is the predecessor to 38 U.S.C. § 4301. The relevant language is identical.

position or able to become requalified with reasonable efforts by the employer ... unless the employer's circumstances have so changed as to make it impossible or unreasonable...." 38 U.S.C. § 4301(a)(B)(ii)(1994). Thus, in order to avoid reinstating Lapine, the Town must have proven either that its circumstances have changed so much that employing Lapine would be impossible or unreasonable or that Lapine is no longer qualified to perform the duties of a police officer. I find that the Town did not establish either of these factors at trial.

It is the Town's burden to prove that circumstances have made reemploying Lapine unreasonable or impossible. *Watkins Motor Lines, Inc. v. De Galliford,* 167 F.2d 274, 275 (5 Cir., 1948). At trial the Town put forth no such evidence. And, indeed, this is a difficult standard to meet. "The statutory exception excusing a refusal to re-employ a veteran where reinstatement would be unreasonable is a very limited exception to be applied only where reinstatement would require creation of a useless job or where there has been a reduction in the work force that would reasonably have included the veteran." *Davis v. Halifax County School System,* 508 F.Supp. 966, 968 (E.D.N.C., 1981)(citing *Kay v. General Cable Corp.,* 144 F.2d 653, 655 (3 Cir., 1944)); *see also* 132 Mil. L.Rev. at 186 ("The generally prevailing view is that a decline in business is not sufficient to deny reemployment."). In *Davis,* the court granted summary judgment for the plaintiff veteran, ruling that it was not unreasonable or impossible for the defendant employer to reinstate the plaintiff even though the defendant had been forced to reduce its total teaching staff by six teachers due to a decline in student enrollment. In the instant case, the Town did not demonstrate any change in circumstances. Indeed, the evidence proved only that the Town continued to hire new officers; Chief O'Loughlin, the Wellesley Chief of Police, testified that he hired at least 15 officers between 1992 and 1997. Thus, I find that the Town has not demonstrated that it is unreasonable or impossible to reinstate Lapine.

Similarly, the Town did not establish that Lapine is not qualified to fulfill the duties of being a police officer. It is the Town's burden to show that Lapine "was not qualified for his former position either at the time he [entered] the service or at the time he sought reemployment." *Duey v. City of Eufaula, Alabama,* No. 79–149–N, 1979 WL 1936, *6 (M.D.Ala., Oct. 31, 1979). Although this was a closer question than the issue of whether it is unreasonable or impossible for the Town to reinstate Lapine, I find that the evidence established that Lapine is still qualified to be a police officer.

The Town presented no evidence that Lapine was not qualified for his prior position at the time he sought reinstatement. Moreover, the Town put forth no evidence that Lapine was not *physically* qualified to fulfill the duties of being a police office at the time he entered the military. To the contrary, when Lapine left his position with the Town in 1990, he was found to be in very good health after undergoing a physical examination.

However, being physically qualified to perform the job is not all that is required. The word qualified as used in the VRRA means more than just physically and mentally able to perform the job a veteran had done before his induction into the service. *Trusteed Funds v. Dacey,* 160 F.2d 413, 420–21 (1 Cir., 1947); *see also Preda v. Nissho Iwai American Corp.,* 128 F.3d 789, 792 (2 Cir., 1997)("the veteran must be not only physically capable of returning to the job but also temperamentally willing

and able to work harmoniously with co-workers and supervisors.").[7]

██ The Town is entitled to (and did) present evidence regarding Lapine's pre-service job performance. "[M]atters affecting a person's qualifications for the job which occur prior to his application for reemployment can be the basis for finding him not qualified for reemployment." *Greathouse v. The Babcock and Wilcox Co.*, 381 F.Supp. 156, 164 (N.D.Ohio, 1974)(citing *John S. Doane Co. v. Martin*, 164 F.2d 537 (1 Cir., 1947)). And, the Town did present some evidence regarding Lapine's ability to get along with others and his emotional state during his tenure with the Town. Specifically, the Town established that Lapine was subject to several disciplinary actions, the latest occurring in 1989, approximately 7 months before Lapine resigned from his position. The Town also showed that in 1981 (nine years before Lapine resigned), Lapine acted irrationally on several occasions and that as a result thereof, the Town recommended that Lapine undergo stress counseling. The so-called "irrational behavior" consisted of several acts-first, when on desk duty, Lapine failed to give proper service to several people who called in requesting assistance. Second, Lapine went into a rage and screamed at several youths who were at the station to bail out a friend who had been arrested and third, Lapine had a physical altercation with another officer.

Finally, the Town proved that Lapine received a five-day suspension in 1983 for putting a chemical in the uniform of a sergeant.

██ The two incidences that could conceivably show that Lapine is not qualified to be a police officer are the actions underlying the suspension (i.e., putting the chemical in another's uniform) and the so-called "irrational actions." For purposes of determining whether Lapine is "qualified", I find that all of the other disciplinary actions are irrelevant. That is, I find that the failure to report to a paid detail and the fact that Lapine showed up late to a seminar have no bearing on whether Lapine is qualified under the VRRA.

The cases that have addressed the issue have consistently held that a veteran is unqualified[8] only if he has demonstrated dangerous or extreme behavior. For example, in *Winfree v. Morrison, Inc.*, 762 F.Supp. 1310 (E.D.Tenn., 1990), the court ruled that the defendant restaurant did not have to reinstate the plaintiff veteran on the grounds that the plaintiff was unqualified under the VRRA because he brought numerous weapons to work, threatened to kill fellow employees and served liquor to underage patrons. Moreover, all of this behavior occurred within six months prior to the plaintiff leaving to enter the service. Similarly, in *Green v. Tho–Ro Products, Inc.*, 232 F.2d 172 (3 Cir., 1956), the court

---

**7.** In the *Preda* case, the veteran was found unqualified because his resignation letter, ". . . both in content and tone, precluded harmonious future relations with co-workers and managers at Nissho [the employer]." 128 F.3d at 792. Lapine's letter expressed extreme dissatisfaction with the then Chief of Police John K. Fritts. By the time Lapine inquired about reinstatement in June, 1992, Mr. Fritts had been replaced by Thomas J. O'Loughlin. There was nothing in Lapine's letter which expressed dissatisfaction with any of his manager or co-workers other than

Chief Fritts, and no evidence has been offered that his extreme dissatisfaction with Chief Fritts would render him unqualified to serve under Chief O'Loughlin or Chief O'Loughlin's successor.

**8.** By "unqualified" in this context, I do not mean physically unqualified, as that is not an issue in the case at bar because there was no evidence presented that Lapine is not physically qualified to resume the duties of his former position as patrolman.

affirmed judgment for the defendant employer, holding that the plaintiff veteran was unqualified under the VRRA because he urged other employees to pass off defective products, created general discord in the workplace and threatened on numerous occasions to ruin the company. *See also Doane, supra,* 164 F.2d 537 (holding that evidence that plaintiff employee was often drunk at work should have been admitted at trial because it bore on the issue of whether he was qualified under the VRRA); *Greathouse, supra,* 381 F.Supp. 156 (ruling for defendant employer on grounds that plaintiff employee was unqualified under the VRRA because he committed fraud on his employment application).

Although Lapine's actions do not appear as egregious as those listed above, his physical altercation with another officer, his failure to assist citizens calling the station for help and his assault on the sergeant by putting chemicals in his uniform might each in and of itself be enough to find Lapine unqualified *if* the instances had happened nearer to the time of his resignation. The problem here is that the irrational actions took place in 1981 and the assault on the sergeant occurred in 1983, both many years before Lapine left his position with the Town. In response to Lapine's unacceptable behavior, the Town took what it deemed to be the necessary steps to discipline Lapine and to ensure that such behavior did not recur, but the Town did not choose to terminate Lapine.[9]

Moreover, much closer to the time of his resignation, Lapine received favorable employee evaluations and a letter of commendation. In 1988 and 1989, Lapine was given overall ratings of "definitely above average" and in 1988, Lapine was given a commendation letter. Finally, when he left the force in 1990, Lapine was not subject to any disciplinary actions. Thus, I find that Lapine's "bad actions" were too remote in time to make him unqualified to be reinstated as a police officer, and I find therefore that the Town is required under the VRRA to reemploy Lapine.[10]

## C. To What Position Must Lapine Be Reinstated and To What Benefits is He Entitled?

Under the VRRA, the Town must reinstate Lapine to his former position or to a position "of like seniority, status and pay." 38 U.S.C. § 4301(a)(B)(i). The Supreme Court has interpreted this provision to mean that the veteran "does not step back on the seniority escalator at the point he stepped off. He steps back on at the precise point he would have occupied had he kept his position continuously...." *Alabama Power Co. v. Davis,* 431 U.S. 581, 584, 97 S.Ct. 2002, 52 L.Ed.2d 595 (1977) (quoting *Fishgold v. Sullivan Drydock & Repair Corp.,* 328 U.S. 275, 284–85, 66 S.Ct. 1105, 90 L.Ed. 1230 (1946)). Thus, it is clear that Lapine is entitled to be viewed, for purposes of seniority, as having been employed continuously with the Town from 1977 until the present.

---

**9.** In addition, there was some evidence put forth that the reasons for Lapine's unacceptable behavior were that he was under stress because he was going through a divorce and that he was dissatisfied with the way the then-police chief was running the force. Neither of these plays a role anymore since Lapine's stress seemed to dissipate long before he resigned, and there is a different police chief now in charge.

**10.** I note that no evidence has been offered as to any "bad actions" on the part of Lapine after his discharge from the service; all of the evidence referred to conduct occurring before he entered the military. After remand from the Court of Appeals, the District Court in *Dacey v. Trust Funds,* 72 F.Supp. 611, 613 (D.Mass., 1947), found Dacey unqualified because of actions he took after returning from the service.

■ In addition, Lapine is entitled to any promotions that would have occurred automatically but is not entitled to promotions that rely "on the exercise of discretion on the part of" the Town. *Alabama Power,* 431 U.S. at 585, 97 S.Ct. 2002. Neither party presented much evidence at trial regarding the promotion system in place in 1990 or currently. The Collective Bargaining Agreement is somewhat unclear regarding promotions but does state that "[s]hould an employee be denied a step rate increase upon the review of his performance by the Chief of Police and the Personnel Board, the employee shall be informed by the Chief of Police in writing of the reason or reasons for such denial." at p. 18. Thus, from the quoted language, it appears that promotions are not automatic but are subject to the discretion of the Chief of Police. Lapine, therefore, is not entitled to any promotions but is entitled only to be reinstated to the rank and step he held upon his resignation. That is, the Town must reinstate him at a rank of patrolman, a pay scale of P–18 and a step 4.[11] Obviously, once Lapine is reinstated, he is entitled to be compensated at whatever rate a patrolman of his pay scale and step is currently receiving.

Under the VRRA, Lapine is also entitled to receive benefits. There are:

two axes of analysis for determining whether a benefit is a right of seniority secured to a veteran.... If the benefit would have accrued, with reasonable certainty, had the veteran been continuously employed by the private employer, and if it is in the nature of a reward for

length of service, it is a "perquisite of seniority." If, on the other hand, the veteran's right to the benefit at the time he entered the military was subject to a significant contingency, or if the benefit is in the nature of short-term compensation for services rendered, it is not an aspect of seniority....

*Alabama Power,* 431 U.S. at 589, 97 S.Ct. 2002. At stake here are Lapine's right to vacation pay, sick pay and credit to his pension plan.

■ I will address the pension plan issue first since that is the most straightforward. "Virtually every court to consider the issue has concluded that pension and retirement plans are perquisites of seniority. Accordingly, employers must make contributions and grant vesting on the returning employee's behalf." 132 Mil. L.Rev. 175, 190. For example, the court in *Alabama Power* held that "pension payments are predominantly rewards for continuous employment with the same employer" and required that the employer pay the veteran employee "the pension to which he would have been entitled by virtue of his lengthy service if he had not" entered the military, 431 U.S. at 594, 97 S.Ct. 2002; *see also Bunnell v. New England Teamsters and Trucking Industry Pension Fund,* 486 F.Supp. 714 (D.Mass., 1980), *aff'd* 655 F.2d 451 (1 Cir., 1981)(holding that appropriate remedy was to compute service credit for veterans in accordance with VRRA rather than pursuant to employer's pension plan and requiring retroactive pension plan payments to be made).[12] Thus, I find that the Town

---

**11.** Lapine is not entitled to be paid for the three years he was in the service because a service man is "not entitled to compensation lost while serving on active duty." 132 Mil. L.Rev. at 192.

**12.** Even though Lapine withdrew his accumulated pension earnings when he entered the

military, he is entitled to the pension payments beginning August 31, 1993. But in computing the payments, he is to be considered a new employee as of May 13, 1990 unless thereafter but before retirement, he "... pay[s] into the annuity savings fund of the Retirement System ... make-up payments in an amount equal to the accumulated de-

must make contributions beginning on the date they should have re-employed him in August, 1993 in an amount to which he would have been entitled had he become a new employee in May, 1990. In other words, for the period from May, 1990 to August, 1993, the Town would not have to make any pension payments on his behalf but for pension purposes, he would be credited with seniority dating to May, 1990.[13]

■ The vacation pay and sick pay issues are somewhat more confusing. In order to determine whether Lapine is entitled to be compensated for his vacation time, I must, under the test set forth in *Alabama Power, supra,* decide first whether it is reasonably likely that vacation time would have accrued had Lapine not entered the service and second, whether vacation time is in the nature of a reward for length of service or if it is in the nature of short-term compensation for services rendered. I find that it reasonably certain that vacation time (and sick time) would have accrued had Lapine never left his position with the Town. It is clear under the Collective Bargaining Agreement that "annual vacations with pay shall be granted to all employees who complete ... continuous full-time employment during the fiscal year...." Exh. 66 at p. 7. There is nothing to suggest that vacation time does not automatically accrue.

In determining whether vacation pay in this case is a reward for length of service or is short-term compensation, I look to *Foster v. Dravo Corp.,* 420 U.S. 92, 95 S.Ct. 879, 43 L.Ed.2d 44 (1975). In that case, the court held that vacation pay is a form of short-term compensation and is not protected under the VRRA *if* the employee must complete some work requirement in order to receive vacation time. 420 U.S. at 99, 95 S.Ct. 879. However, "where it clearly appears that vacations were intended to accrue automatically as a function of continued association with the company," then vacation benefits are protected and the returning veteran is entitled to receive vacation pay as if he had been continuously employed. *Id.* at 101, 95 S.Ct. 879; *see also LiPani v. Bohack Corp.,* 546 F.2d 487, 489–90 (2 Cir., 1976)(holding that vacation pay is short-term compensation because an employee must work six months before getting any vacation, vacation pay was computed on the basis of the employee's weekly earnings and if an employee was laid off, he received vacation pay on a pro rata basis).

In *Dravo,* an employee was required to work at least 25 weeks in a year to receive any vacation time. Once an employee worked 25 weeks, he was then accorded the same amount of vacation time as one who worked a full year. Moreover, additional vacation credit was given to employees who worked substantial overtime.

The case at bar is distinguishable from *Dravo* because here vacation time appears to accrue automatically as a function of continued association with the Town. It is true that an employee must work for at least six months to receive any vacation time, but once that requirement is met, vacation time accrues automatically as a simple function of how long an employee has been employed by the Town.[14] There is no work performance requirement. Also, no additional vacation time is given for

---

ductions [which he withdrew] ... with regular interest." *See* Exh. 2.

**13.** Unless he paid back the amount he had withdrawn with interest. *See* footnote 12, *supra.*

**14.** For example, an employee who has been with the Town for ten years receives 25 shifts of vacation time and one who has been there for twenty years receives 26 shifts.

overtime work and laid-off employees are not accorded vacation time on a pro rated basis but are given the full amount of vacation time for that year. *See* Collective Bargaining Agreement at pp. 5, 8. Even more important here, however, is that the Collective Bargaining Agreement specifically spells out that "[s]ervice in the Armed Forces shall not be considered an interruption of work for the purposes of computing total service credit for vacation purposes." at p. 9.[15]

In short, I find that in the instant case, vacation time is a reward for length of service not short-term compensation for work performed and thus Lapine is entitled to receive pay for the vacation shifts he would have received had he been continuously employed by the Town.

■ Determining whether Lapine is entitled to back sick pay requires the same analysis as whether Lapine is entitled to back vacation pay-that is, is sick time a reward for length of service or is it in the nature of short-term compensation?[16] The Collective Bargaining Agreement (at p. 10) addresses sick leave and sets out that an employee must be with the Town for at least one month before acquiring any sick leave and that sick pay will be calculated as a percentage of the employee's weekly salary. Thus, under the factors set out in *Lipani, supra,* 546 F.2d at 489, it seems that sick leave in the instant case is short-term compensation. Another factor supporting this conclusion is that employees who use their sick days are penalized by being forbidden from working

extra shifts and extra details. For example, if an employee uses between four and nine sick days, he is precluded from working extra shifts and extra details for the following three days. Collective Bargaining Agreement at p. 11. Thus, although sick time is not clearly tied to work performed, if sick time is used, then the ability to work extra shifts and details is affected. Therefore, I find that sick leave is in the nature of short-term compensation and that Lapine is not entitled to receive compensation for back sick pay.

### D. Is Lapine Entitled to Lost Wages?

■ In short, Lapine is entitled to receive lost wages. The VRRA, sets out, in relevant part, that an employer must compensate the returning veteran "for any loss of wages or benefits suffered by reason of such employer's unlawful action." 38 U.S.C. § 4302. Credit must be given for the wages Lapine earned in the years he was not working for the Town, but the Supreme Court has held that courts should not consider unemployment compensation in reducing an award of back pay. That is, the Town must pay Lapine for lost wages and can subtract the amount of wages he actually earned working at other jobs, but the Town may not subtract the approximately $10,000 Lapine received in unemployment payments. *See Boston & M.R.R. v. Bentubo,* 160 F.2d 326, 328–29 (1 Cir., 1947) (the VRRA "imposes a categorical obligation upon district courts to reduce the damages awarded in cases of this sort" by the amount of wages actually

---

**15.** One of the factors that the court in *Lipani, supra,* 546 F.2d at 491, found persuasive in denying back vacation and sick pay to a returning veteran was that the collective bargaining agreement in place contained "no specific provision for vacation or sick leave benefits for employees on furlough or leave of absence." Here, the Collective Bargaining Agreement specifically addresses employees on leaves of absence and makes an explicit exception for those employees who leave to enter the service.

**16.** I already held above that sick leave was reasonably likely to accumulate had Lapine never entered the military, thus satisfying the first prong of the *Alabama Power* test.

earned); *Chesna v. International Fueling Co.*, No. 80–2230, 1983 WL 21386, *2 (D.Mass., Dec. 17, 1983), *aff'd* 753 F.2d 1067, 1984 WL 180698 (1 Cir., 1984) (back pay under VRRA "is to be reduced by amount of wages the plaintiff actually received in other employment."); *National Labor Relations Bd. v. Gullett Gin Co.*, 340 U.S. 361, 364–65, 71 S.Ct. 337, 95 L.Ed. 337 (1951) (holding that unemployment compensation should not be deducted from a back pay award under the National Labor Relations Act because failing to deduct unemployment payments does not make the employee more than "whole.").

■ Finally, it is within my discretion to award prejudgment interest and I find that Lapine is entitled to such interest on the amount of the back pay award. Awarding him interest on his back pay will properly compensate him and make him whole. *See Hembree v. Georgia Power Co.*, 637 F.2d 423, 429 (5 Cir., 1981) (holding that because it was "clear that plaintiff [veteran] was deprived of reemployment rights explicitly granted to him by Congress [under the VRRA], [t]he only way he can be made whole is by awarding him prejudgment interest."); *Hanna v. American Motors Corp.*, 724 F.2d 1300, 1311 (7 Cir., 1984), *cert. denied*, 467 U.S. 1241, 104 S.Ct. 3512, 82 L.Ed.2d 821 (1984) ("interest is a proper ingredient of the instant 'make whole' remedy and should be granted. Prejudgment interest is viewed as effecting the purposes of the [VRRA]"). Therefore, the Town must pay Lapine for his lost wages minus the wages he earned at other jobs, and the Town must also pay Lapine prejudgment interest on the award.

## IV. CONCLUSION

I hereby conclude that the Town must reinstate Lapine to his prior position as a patrolman with a pay grade of P–18 and Step 4 and must pay him at the rate that other patrolmen of his pay grade and step are paid. Further, the Town must make payments to its pension plan on Lapine's behalf in the amount to which Lapine would have been entitled had he begun as a new employee on May 1, 1990 and must make back payments from August, 1993 to the date of reinstatement. Finally, the Town must pay Lapine back vacation pay and lost wages with prejudgment interest.

## V. PROCEDURAL ORDER

Judgment shall enter on June 15, 2001 ordering the Town to reinstate Lapine as of June 18, 2001 and awarding Lapine an amount of monetary damages for back pay from August 31, 1993 through June 15, 2001 (less the amounts Lapine has earned from other employment) and vacation pay to June 15, 2001. The judgment shall also order the Town to make payments to the retirement fund from August 31, 1993 to date of judgment and grant Lapine seniority for pension purposes to May 13, 1990.

Counsel are to agree and submit to the Court, **on or before the close of business on Monday, May 21, 2001,** a form of judgment which includes the precise amount of damages to which Lapine is entitled for back pay (less amounts he has earned from other employment) and vacation pay in accordance with the Court's findings and conclusions contained herein.

If counsel cannot agree on the form of judgment, they shall file, **on or before the close of business on Monday, May 21, 2001,** a joint statement setting forth those items as to which agreement has been reached as to the form of judgment and those which are in dispute. As to those in dispute, the joint statement shall set forth the precise positions of the parties as to each disputed item.